No. 22-55159

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

ATHENA COSMETICS, INC., a Delaware corporation,

Plaintiff,

v.

AMN DISTRIBUTION INC., a Delaware corporation, et al.,

Defendants-Appellees,

v.

MARINA LOUISE LANG; SOCAL IP LAW GROUP, LLP,

Real-party-in-interest-Appellants.

_____

On Appeal from the Orders of the United States District Court
for the Central District of California
Case No. 2:20-cv-05526-SVW-SHK
Hon. Stephen V. Wilson

_____

## OPENING BRIEF OF REAL-PARTY-IN-INTEREST APPELLANTS
## MARINA LOUISE LANG AND SOCAL IP LAW GROUP, LLP

_____

Dan Lawton, State Bar No. 127342
KLINEDINST PC
501 West Broadway, Suite 600
San Diego, California 92101
(619) 239-8131/Fax: (619) 238-8707
dlawton@klinedinstlaw.com

Attorneys for Real-party-in-interest-Appellants

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.   Parties and players . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. This action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. Judge Wilson's summary contempt and disqualification
     orders of November 17, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.   Ensuing orders re civil contempt . . . . . . . . . . . . . . . . . . . . . . . . 38

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 44

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

I.    The district court committed clear error when it found
      Ms. Lang in civil contempt, because (a) there was no
      clear and convincing evidence of violation of a specific
      and definite court order, and (b) Ms. Lang's interpretation
      of the pretrial order was in good faith and reasonable . . . . . . . . 47

i

# TABLE OF CONTENTS

A.        No clear and convincing evidence of violation of a specific and definite order . . . . . . . . . . . . . . . . . . 47

B.        Good faith and reasonable interpretation of pretrial order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

II.   The district court erred by finding Ms. Lang in civil contempt and ordering her to pay monetary sanctions without holding a hearing or allowing Ms. Lang to testify or call witnesses in her own defense, thus depriving Ms. Lang of due process of law . . . . . . . . . . . . . . . . . . . . . . . . . . 55

III.  If it should remand for an evidentiary hearing rather than reverse the civil contempt order outright, the Court should assign a new District Judge to the case . . . . . . . . . . . . . . . . . . . . 62

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armstrong v. Manzo*
    380 U.S. 545, 550 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Crystal Palace Gambling Hall, Inc.*
    817 F.2d 1361, 1363 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dual-Deck Video Cassette Recorder Antitrust Litig.*
    10 F.3d 693, 695 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . .45, 47, 55

*In re Dyer*
    32 F.3d 1178, 1190-1191 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 40, 47

*Earp v. Cullen*
    623 F.3d 1065, 1072, 1078 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 68

*Ellis v. U.S. Dist. Court (In re Ellis)*
    35 F.3d 1198, 1211 (9th Cir. 2004) (en banc) . . . . . . . . . . . . . . . . . .62, 68

*F.T.C. v. Affordable Media*
    179 F.3d 1228, 1239 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Gompers v. Bucks Stove & Range Co.*
    221 U.S. 418, 443 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Go-Video v. Motion Picture Ass'n of Am.*
    10 F.3d 693, 695 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**Page**

## CASES

*Groppi v. Leslie*
 404 U.S. 496, 500 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Contempt of Greenberg*
 849 F.2d 1251 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 53, 70

*In re McConnell*
 370 U.S. 230, 236 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*In re Osborne*
 344 F.2d 611, 616 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Int'l Union, United Mine Workers of Am. v. Bagwell*
 512 U.S. 821, 832 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 59, 60

*Kismet Acquisition, LLC v. Diaz-Barba (In re Icenhower)*
 755 F.3d 1130, 1139 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 56

*Lasar v. Ford Motor Co.*
 399 F.3d 1101, 1114, n.12 (9th Cir. 2005) . . . . . . . . . . 46, 54, 56, 57, 60

*Living Designs, Inc., v. E.I. DuPont de Nemours & Co.*
 431 F.3d 353, 373 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Maness v. Meyers*
 419 U.S. 449, 458 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Pennwalt Corp. v. Durand-Wayland, Inc.*
 708 F.2d 492 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Peterson v. Highland Music*
 140 F.3d 1313, 1323 (9th Cir. 1998) . . . . . . . . . . . . . 45,  47, 57, 59, 60

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Reebok Int'l, Ltd.  v. McLaughlin*
    49 F.3d 1387, 1390 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Taylor v. Hayes*
    418 U.S. 488, 499 (1974) . . . . . . . . . . . . . . . . . . 54, 57, 58, 59, 60, 61, 68

*Thomas, Head & Greisen Emps. Tr. v. Buster*
    95 F.3d 1449, 1458 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*In re Tillman*
    756 F.2d 1144, 1151 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Ayres*
    166 F.3d 991, 995 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 57, 59, 60, 66

*United States v. Galin*
    222 F.3d 1123 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Gardenhire*
    784 F.3d 1277, 1284 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Glass*
    361 F.3d 580, 589-591 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Sears, Roebuck & Co.*
    785 F.2d 777, 779-782 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 62, 68

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*
    689 F.2d 885, 891 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Young v. United States ex rel. Vuitton et Fils S.A.*
    481 U.S. 787, 822 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**Page**

**STATUTES AND RULES**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Fed. R. App. P. 4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Crim. P. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 32, 64

**OTHER AUTHORITIES**

LEWIS CARROLL,
    THROUGH THE LOOKING-GLASS, Ch. 6 (Macmillan 1872) . . . . . . .  65

## <u>INTRODUCTION</u>

Near the end of a one-day civil trial below, U.S. District Judge Stephen V. Wilson declared real-party-in-interest-appellant Marina L. Lang, an attorney, in contempt of court during her closing argument to the jury. Then he summarily disqualified her from the case and ordered her arrested and jailed without bail. Armed U.S. Marshals put Ms. Lang in handcuffs, leg irons, and chains before perp-walking her out of the courtroom in front of the jury and putting her in a filthy, windowless, barred, and freezing jail cell in the basement for several hours. Ms. Lang didn't resist or give Judge Wilson or the Marshals any reason for the use of such severe force against her. Later, Judge Wilson ordered Ms. Lang released and ejected from the courthouse. The Marshals released her after hours, leaving her stranded at night on the courthouse steps in downtown Los Angeles.

Afterward, Judge Wilson set a hearing on civil contempt – but, shortly after Ms. Lang's lawyers filed notices of their appearances, he vacated the hearing, ruled Ms. Lang in civil contempt, and ordered her to pay $3,150 in attorneys' fees to the defendant. Judge Wilson's order included false denials he had summarily held Ms. Lang in contempt in

the first place, thus excusing his having ignored the summary contempt procedures which Fed. R. Crim. P. 42 required him to follow.

In making these orders, Judge Wilson committed clear error and deprived Ms. Lang of her liberty without due process of law. The result was wrongful harm to the person, reputation, and psyche of an officer of the court.

Ms. Lang is out of jail and not facing any further confinement, so she lacks an appellate remedy for her incarceration. But she has a remedy for Judge Wilson's erroneous civil contempt order and cancellation of the hearing at which she could have defended herself and explained her conduct. That remedy is a reversal of that order. Should the Court think further contempt proceedings necessary on remand, it should instruct the clerk of the district court to reassign the matter to a new District Judge, to uphold the appearance of justice.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Real-party-in-interest appellants, Ms. Lang and her law firm, are non-parties to this case. They appeal an order of civil contempt. Such an order is appealable under 28 U.S.C. § 1291. *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1363 (9th Cir. 1987). The Court has jurisdiction, as it previously ruled on April 19, 2022. Doc. 233.

The date of entry of the order of civil contempt appealed from is January 26, 2022.

The date of filing of the notice of appeal is February 7, 2022.

The statute or rule under which it is claimed the appeal is timely is Fed. R. App. P. 4(a)(1).

## ISSUES PRESENTED

I.     Judge Wilson issued a pretrial order which was ambivalent as to use of the term "counterfeit," which order an ensuing jury instruction rendered more ambivalent.  The same order framed as an issue for jury decision the issue of whether defendants had breached a settlement agreement by selling counterfeit products.  During the one-day trial which followed, Ms. Lang used the word "counterfeit," sometimes interrupted Judge Wilson, argued with some of his evidentiary rulings, referred to the settlement agreement (which Judge Wilson excluded from the evidence), and raised her voice to the court. Did Judge Wilson commit reversible error by ruling that Ms. Lang had committed civil contempt by doing so?

II.     Later, in abruptly vacating the January 24, 2022 hearing on civil contempt which followed Judge Wilson's summary jailing and disqualification of Ms. Lang, did Judge Wilson violate Ms. Lang's rights under the Due Process Clause of the fourteenth amendment to the U.S. constitution by depriving her of an opportunity to testify in person, call witnesses in her defense, and explain her conduct to the court before suffering a judgment for civil contempt and monetary sanctions?

III.   If the Court should remand for the contempt hearing that Judge Wilson scheduled and then canceled, should the Court order the matter reassigned to a new District Judge?

# STATEMENT OF THE CASE

## I.     Parties and players.

Real-party-in-interest appellant Marina L. Lang completed her undergraduate studies at the University of Southern California, where she earned two B.A. degrees and graduated *magna cum laude*.  At USC, Ms. Lang played intercollegiate Division I water polo, winning two national championships in that sport and earning an invitation to try out for the U.S. Olympic team.  She earned her law degree at Duke University School of Law, graduating *cum laude*.  She served on the executive board of the DUKE LAW AND TECHNOLOGY REVIEW, which published a note which she authored on ethics in patent law.  She is a member of the State Bar of California and is admitted to practice in the Central District of California.  2-ER-52, 53.

Ms. Lang's practice focuses on intellectual property litigation.  Her clients include individuals, start-ups, and publicly-traded companies.  She is a partner of her co-real-party-in-interest-appellant, SoCal IP Law Group LLP, a boutique law firm in Los Angeles County which specializes in intellectual property law.  She has practiced federal trademark law and complex federal litigation throughout the U.S.,

mostly in the Central District of California, for over fourteen years. She has lectured on intellectual property law at several law schools. Before this case, no court had cited her for contempt or even warned her that she was at risk of contempt. She has never been disciplined by the State Bar or sanctioned by any court. Before this case, she had never been arrested or jailed. 2-ER-52, 53.

Before Judge Wilson disqualified her summarily below, Ms. Lang and her law firm represented Athena Cosmetics, Inc., the plaintiff in this matter. Ms. Lang has represented Athena for over a decade on various matters, including counterfeit prosecution. 2-ER-53. Athena is a cosmetics company which proivdes eyelash and eyebrow products, notably the RevitaLash® products, which are designed to enhance the health and natural beauty of eyelashes.

Defendants in the trial below were AMN Distribution Inc. and Moishe Newman. They are not parties to this appeal.

Stephen V. Wilson is a U.S. District Judge who received his commission from President Ronald Reagan in 1985. He was the trial judge below. He made the orders which resulted in this appeal.

## II.   Background.

This case had its genesis in a settlement agreement which Athena and AMN signed in April 2020.  The settlement agreement memorialized the resolution of a prior dispute over AMN's illicit sales of counterfeit Athena merchandise.  *See* 2-ER-62.  The settlement agreement obliged AMN and Mr. Newman to refrain from buying, selling, manufacturing, warehousing, importing, distributing, delivering, marketing, offering for sale, or using any goods bearing Athena's marks, including counterfeit Athena products.  It also required AMN to identify companies that supplied AMN with counterfeit Athena products (RevitaLash® and RevitaBrow®).  The settlement agreement obliged AMN to report to Athena in the form of two detailed written schedules:  (1) Schedule I, listing contact information of AMN's suppliers of counterfeit Athena products during 2019, including phone numbers, emails, and contact persons;  and (2) Schedule II, listing the volume of counterfeit Athena products purchased by AMN from sellers of those products during 2019 and re-sold to AMN customers during 2019.  *See* 3-ER-415-416, 442.

Later, Athena learned that AMN and Mr. Newman secretly continued selling goods bearing Athena's marks, including counterfeit goods, and falsified sales data on Schedules 1 and 2 so as to deceive Athena into believing that AMN was honoring the settlement agreement. *See* 3-ER-415-416, 442.

## III. This action.

In June 2020, Athena sued AMN and Mr. Newman, asserting claims for breach of the settlement agreement and trademark infringement, in the district court. In March 2021, Athena amended its pleading, filing a first amended complaint which alleged multiple claims. These included a breach of contract claim asserting defendants had breached the settlement agreement by, *inter alia*, selling Athena counterfeit goods. *See* 3-ER-427-446.

Judge Wilson bifurcated the case into two phases. In the first phase, a jury would decide whether AMN had breached the settlement agreement by making inaccurate or incomplete disclosures about purchases and sales of products bearing Athena marks. In the second phase, the jury would decide Athena's trademark infringement claim. 2-ER-316.

A month before trial, Athena filed a witness list.  It listed several witnesses, including Christina Felix.  Four of them, including Ms. Felix, would testify as to AMN's purchases and sales of counterfeit Athena products, the list said.  3-ER-422-423.  On the same day, Athena filed an exhibit list.  Included were descriptions of products and records showing AMN's sales of counterfeit Athena products.  3-ER-424-426.  In Athena's memorandum of contentions of facts and law, also filed the same day, Ms. Lang wrote that defendants' breaches of the settlement agreement included the knowing sale of counterfeit cosmetic products with Athena trademarks, including RevitaLash® goods.  3-ER-416.

Athena's trial brief, filed a few weeks later, argued that defendants' marketing and advertising of counterfeits after the settlement agreement's effective date voided the release given in the settlement agreement and made every sale of an Athena counterfeit actionable.  3-ER-535-358.  In its own memorandum and trial brief, AMN acknowledged Athena's allegation that AMN breached the settlement agreement by continuing to sell Athena counterfeit goods after the effective date of the settlement agreement, and promised to

point to an absence of evidence at trial to prove a post-settlement sale of counterfeit goods on its part.  3-ER-321-348, 385-387.

On November 16, 2021 – the day before the trial below – Judge Wilson issued a pretrial order.  It defined the issues for trial as set forth below:

1. Whether Defendants breached the Settlement Agreement by making inaccurate or incomplete disclosures of its buyer and sellers. Specifically, this includes:

   a. Whether Schedule 1 included the "full and complete contact information" that  AMN and Moishe had for each seller;

   b. Whether Schedule 1 accurately disclosed the amount of product purchased from eBay user "Sterlingwoman";

   c. Whether the 1,639 unit discrepancy between the amount AMN and Moishe bought and sold in 2019 was the result of inaccurate or incomplete disclosures of their suppliers.

2. Whether Defendants breached the Settlement Agreement by continuing to market and sell Athena goods after the effective date of the Settlement Agreement.

   a. Whether records from Walmart, eBay, and Groupon show AMN and Moishe's continued marketing and sales of Athena goods;

   b. Whether AMN and Moishe operated under the eBay username "Michwa-10" and sold

> *counterfeit* Athena goods to Christina Felix in
> October 2020.

2-ER-317, 3-ER-319 (italics added).

The pretrial order also provided that the parties' arguments and evidence should be directed only towards these issues or matters that were necessary to lay a foundation or provide essential background for these issues. "Additionally," Judge Wilson wrote, "Athena may not present evidence or argument about the nature of its RevitaLash products compared to counterfeit products, characteristics of a counterfeit RevitaLash product, or the specific Athena trademarks infringed by a counterfeit product." 3-ER-319.

**IV. Judge Wilson's summary contempt and disqualification orders of November 17, 2021.**

The jury trial of phase one ensued before Judge Wilson on the morning of November 17, 2021, in courtroom 10A on the tenth floor of the First Avenue courthouse in downtown Los Angeles.  *See* 2-ER-137.

Before bringing the jury in, Judge Wilson observed the trial involved "just a straight question of whether the objective evidence constitutes or not a breach of the Settlement Agreement."  2-ER-158:18-20.  There would be one live witness, Christina Felix, a "secret shopper" who would testify as to counterfeit Athena products which she found and ordered from a company whose return address matched that of AMN's warehouse in Plains, Pennsylvania.  2-ER-158, 197:12-18, 203:3-14.  The remainder of the evidence would consist of business records authenticated by declarations of custodians of records and exhibits as to which no party objected.  2-ER-166-167.

Before the jury entered, Ms. Lang tried to address the court on the issue of the scope of Felix's testimony.  But Judge Wilson cut her off:

> MS. LANG:        . . . Regarding the math, the 1600 unit discrepancy, that will be discussed in a testimony of Christina Felix because she did the math.  When a Settlement Agreement was furnished –

THE COURT:     Well, why does she have to do the math? The document speaks for itself.  You could argue.

MS. LANG:     These are – are the jurors going to take out their calculator to confirm? . . . The best –

THE COURT:     One moment.  It's 1639, is that the agreed number?  The discrepancy –

MR. VOSS:[1]     With permission of the Court, which is required to stipulate [sic], we would stipulate.

THE COURT:     All right, then.  Then she won't testify to that.  It's stipulated to.  And so –

MS. LANG:     Stipulate to where?

THE COURT:     Ma'am, it's stipulated.  There is no need for testimony.  It's agreed that there is that discrepancy.  So, Ms. Felix can testify about her shopper experience, and that's the only live witness.

MS. LANG:     But, your Honor, I do –

THE COURT:     *I can't go through this again with you [sic].[2] Please be seated.  Be seated, ma'am.  Okay, bring the jury back.*

MS. LANG:     Your Honor, is there –

THE COURT:     Be seated, ma'am.

2-ER-166-167 (italics added).

---

[1]  Attorney David C. Voss, Jr., was defense counsel below.

[2]  Judge Wilson had not "gone through this" with Ms. Lang before this exchange.

The jurors entered and sat down in the jury box. Ms. Lang started her opening statement. Judge Wilson interrupted her:

MS. LANG:  We'll ask you, ladies and gentlemen, to decide if the defendants broke their promise resulting in this current trial today. And the defendants –

And what brought us to the promise, which is the subject Settlement Agreement, starting in 2019. The evidence will show that Athena Cosmetics, after launching –

THE COURT:  You're getting into exactly what I said would not be at trial.

MS. LANG:  Which is?

THE COURT:  It's not what was involved in the underlying dispute it's what is – what the Settlement Agreement provided and what objectively the defendant disclosed pursuant to the agreement or should not have. . . .

If you want to read from the Settlement Agreement itself what parts you're relying on, but not the underlying dispute, nothing about what Athena launched or not.

MS. LANG:  Indeed, your Honor, but we are evaluating the materiality of the breach.

THE COURT:  There's no issue of materiality here.

MS. LANG:  Well, the facts –

THE COURT:  *Ma'am, if we keep going on this way, I'm going to have to excuse you from continuing your opening statement.*

MS. LANG:  I'm telling the Athena story.

THE COURT:  *Ma'am, Athena's story is not relevant here.*

2-ER-171-172 (italics added).

After interrupting Ms. Lang a third time, Judge Wilson terminated her opening statement and told her to sit down. 2-ER-172-173.

Defense counsel, Mr. Voss, began his opening statement. When Ms. Lang objected that Mr. Voss was speculating about what certain documents would show, Judge Wilson overruled her. Ms. Lang argued with the ruling:

> MS. LANG:    Objection, your Honor.  These are self-authenticating documents, and he's not a witness.
>
> THE COURT:    Objection is overruled.  He's just outlining what the documents he thinks will show.
>
> MS. LANG:    What he thinks will show?  Objection. Speculation.
>
> THE COURT:    *Ma'am, don't argue a ruling.  I ruled.  You may be seated.  Go ahead, sir.*

2-ER-176-177 (italics added).

Judge Wilson invited Ms. Lang to call her first witness or ask the court to receive certain records into evidence. Ms. Lang offered three exhibits; Judge Wilson received them. This colloquy followed:

> THE COURT:    . . . Will there be a witness from Groupon?
>
> MS. LANG:    No, your Honor.  This is –

THE COURT: No, just answer my question, and nothing more for a start. There won't be a witness from Groupon?

MS. LANG: And I'm not admitting any other –

THE COURT: I didn't ask you for any – Will the jury please file out for a moment?

(Following proceedings held outside the presence of the jury.)

THE COURT: Ms. Lang, you're talking to counsel, and I instructed not to [sic].[3]

*Ms. Lang, I want to tell you in as clear a way as I can. We've had any number of hearings and conferences. Your conduct has been consistent; that is, that you don't listen to the questions I ask, and you proceed to answer them in the way you want to and not the question, and you make many extraneous statements. That was meddlesome during the pretrial hearings, but now we're in a jury trial.*

MS. LANG: Yes, your Honor.

THE COURT: *And I cannot tolerate that. It has started again.*

MS. LANG: But, your Honor –

THE COURT: You're interrupting me again.

*And I'm just putting you on notice that if you continue to speak after I make a ruling on an objection, if you respond to what counsel says without permission and if you continue in that vein, it becomes almost impossible for me to control the proceedings.*

*We've only been at this for a short while, and I'm reaching a level of exasperation.*

---

[3] Judge Wilson did *not* instruct counsel they could not communicate with their own colleagues during the trial while at counsel table.

MS. LANG:     I understand –

THE COURT:     *I didn't ask you to comment at this point. I'm just telling you that if this persists, you're going to give me no recourse but to hold you in contempt. That would be very undesirable from my standpoint. That's something in my many years on the Court I've done very rarely, but you have reached the point where I just cannot control the proceedings. And you need not respond. That is –*

MS. LANG:     It's not fair. It's not fair, your Honor.

(Ms. Lang weeping)

THE COURT:     *Ma'am, I'll determine what's fair.*

MS. LANG:     This is my case. This is my client. I'm advocating for them.

THE COURT:     Ma'am –

MS. LANG:     They're paying me a lot of money –

THE COURT:     Ma'am –

MS. LANG:     -- for advocating for them.

THE COURT:     *Ma'am, you are in contempt. You're in contempt of court. You are now in contempt of court.*

*I'll deal with that following the trial.*

Now we'll bring the jury back.

2-ER-180-182 (italics added).

Ms. Lang called Christina Felix to the stand. Every time Ms.

Lang used the word "counterfeit" in her questions or Ms. Felix

volunteered it in an answer, Judge Wilson sustained objections on the

18

ground of relevance.  2-ER-188, 189, 192, 195.  This was despite Judge

Wilson's identification of one basis for Athena's breach of contract

theory AMN's "sale of *counterfeit* Athena goods to Christina Felix in

October 2020" in his pretrial order of the day before.  *See* 3-ER-319, #

2)b (italics added).

While the jury took a break, Judge Wilson considered exhibit 104,

a 77-page chart, prepared by Ms. Lang's office, which listed certain

sales of AMN products through the Walmart retail chain.  Colloquy

ensued over foundation for admission of the document into evidence:

> THE COURT:    [D]o the columns and the typing of this
> document, were they prepared by your office?
>
> MS. LANG:     I have four [paralegals].[4]
>
> THE COURT:    What did you say?
>
> MS. LANG:     I have four [paralegals].[5]  I'm not sure how
> to prepare this.  But yes.
>
> THE COURT:    I mean, I can't accept that answer because
> you're the primary lawyer, and you're telling me you don't
> know how an exhibit that you're a proponent of was
> prepared.  How was it prepared?
>
> MS. LANG:     Your Honor, am I being deposed?

---

[4] The court reporter erroneously transcribed this word as "parallels
[sic]."

[5] *See* n.3 above.

THE COURT:    Don't ask me questions.  You're to respond to my questions.  How was it prepared?  Was it prepared from people in your staff who looked at original documents of some kind, invoices or other things.

MS. LANG:    No, your Honor.

THE COURT:    Then how was it prepared?

MS. LANG:    All of the Walmart exhibits have been entered into evidence.  And so, if –

THE COURT:    I can't understand why you can't respond to a question.  It's not a question of –

MS. LANG:    Because I'm a witness now.

THE COURT:    *Ma'am, you're just digging a deeper hole for yourself.*

2-ER-220-221 (italics added).

As colloquy over exhibit 104 continued, things continued in the same vein:

THE COURT:    I didn't ask that.  In Exhibit 35 and 36, do they consist of the original records which may be the basis for this Exhibit 104?

MR. VOSS:    If I was able to pull my laptop out, I [might] be able to tell –

THE COURT:    Go ahead.  Take a look.

MR. VOSS:    Thank you, your Honor.

MS. LANG:    Your Honor –

THE COURT:    *I didn't ask for a comment.*

MS. LANG:    But no, no, no.  On a different issue.

20

> THE COURT:     *You're finding other grounds for being held in contempt.*
>
> MS. LANG:       Just –
>
> THE COURT:     *You don't learn.  I'm going to give you an opportunity when I get to it.  Not when you want to.  When I get to it.*

2-ER-223-224 (italics added).

A recess followed.  The reporter's transcript reflects this comment made by Ms. Lang just after Judge Wilson ordered the recess:

> MS. LANG:       Oh, and then also – because I don't want to get in trouble when the jury comes back, I forgot to move into exhibit[s] plaintiff's exhibit 1.  Oh, and the Settlement Agreement.
>
> COURT CLERK:       This honorable court stands in recess.
>
> (Recess taken)

2-ER-226.

Before the jury returned, counsel and Judge Wilson addressed the admission of certain exhibits, jury instructions, and the verdict form.  2-ER-226-233.

Judge Wilson then instructed the jury.  His instructions, which he wrote himself, included explicit reference to the settlement agreement and three (3) references to what he called "Athena imitation products":

> There is no dispute in this case that *the Settlement Agreement* between the parties constituted a valid contract.

The task for you, as the jury, is to decide whether the defendants violated their obligations under the contract. . . .

\*      \*      \*

There are two obligations that are relevant to this case. First, the Settlement Agreement required AMN to disclose the entities from which it bought and sold Athena products or *Athena imitation products* in 2019. . . .

Second, the Settlement Agreement required Defendants AMN and Newman to refrain from selling any Athena products or *Athena imitation products* after the Effective Date of the Agreement, which was April 30, 2020. Specifically, the Agreement required Defendants to refrain from, among other things, selling[,] delivering, marketing, offering for sale, advertising, promoting, displaying or otherwise using any Athena products *or Athena imitation products*.

2-ER-239 (italics added).

A special jury instruction asked jurors to find whether AMN had operated under an alias on eBay, "Michwa-10," and sold "Athena goods that Christina Felix purchased in October 2020[.]" 2-ER-126.

The court then invited Ms. Lang to make her closing argument. This exchange followed:

MS. LANG:     Thank you, your Honor.

Athena needs to enter the Settlement Agreement into evidence.

THE COURT:    Make your final argument if you would, please.

MS. LANG:	In the Settlement Agreement, signed by Athena and the defendant in this case, the deal was:  Tell us your source.

Athena makes cosmetic products that are applied to eyelashes.  Counterfeits are extraordinarily dangerous.

MR. VOSS:	Objection, your Honor.

THE COURT:	That's not in evidence.  Objection is sustained.

MS. LANG:	In the Settlement Agreement the defendants are required to list full and complete contact information of the almost 3,000 units, the source of their almost 3,000 units of counterfeit products.  You will see in Schedule I of the Settlement Agreement, which the defendant was obligated to provide, that they purchased and sold Revitalash Advance, 3.5 milliliters.

MR. VOSS:	Objection, your Honor.  Referring to exhibit not in evidence.

THE COURT:	Sustained.  I don't understand what you're referring to.  The objection is sustained.

2-ER-241-242.

As Ms. Lang's closing argument unfolded, Judge Wilson

interrupted and challenged her several times:

MS. LANG:	I urge you to look inside the business records to see the defendants operate a very lucrative scheme of selling goods.

THE COURT:	Ma'am, there is absolutely no evidence whatsoever of the defendants –

MS. LANG:	I'm asking the jury to look at the record.

THE COURT:     Do the records show they had a scheme?

MR. VOSS:     Your Honor –

THE COURT:     I mean, a scheme implies something different than a business.  There is absolutely no evidence of that.

MS. LANG:     I thought –

THE COURT:     Objection is sustained.[6]  If you continue to argue –

MS. LANG:     Isn't this arguing time?

THE COURT:     *One minute, now.  If you continue to argue beyond the record, and you have now, I will have to foreclose your argument.*

MS. LANG:     The evidence will show that defendants failed to identify their source of counterfeit goods.

THE COURT:     Don't raise your voice.  Just make an argument.

MS. LANG:     The evidence will show that defendants failed to identify a single source as promised.

The evidence will show that to this day my client has no idea who the defendant's supplier is.

MR. VOSS:     Objection, your Honor.  Not supported by the record.

THE COURT:     That is not in evidence, not even the Settlement Agreement.

---

[6] Defense counsel had objected to Ms. Lang's reference to the Settlement Agreement, as to an exhibit not in evidence.  RT at 108:18-19.

THE COURT:   *Ma'am, you know, I'm going to give you one last opportunity to argue from the evidence in the record. Otherwise I'm going to have to abort your final argument and – because we can't operate this way.*

MS. LANG:        The agreement –

THE COURT:   One last chance –

MS. LANG:        The agreement I hoped that they have a chance to look at, the Settlement Agreement, I hope the jurors have a chance to look at the Settlement Agreement that's at issue here.  I don't know if they do.

MR. VOSS:        Objection, your Honor.  No. 1, this is violating --

THE COURT:   *Ma'am, I can't allow you to continue.*

2-ER-244-246.

Ms. Lang tried to continue, but to no avail:

MS. LANG:        Your Honor, I don't know what I'm allowed to argue, because I don't know if they can see the Settlement Agreement.

THE COURT:   *You may be seated, ma'am.*

MS. LANG:        Will the jury –

This is my client.  They are paying me a lot of money to advocate for them, and you won't even let the jury see the Settlement Agreement.  This is outrageous.

MR. VOSS:        Objection, your Honor.

MS. LANG:        The Settlement Agreement isn't even in evidence, and you won't even let me get it into evidence.  And that's not okay.

MR. VOSS:        Objection, your Honor.

MS. LANG: I could lose my license if I don't scream from the top of the wall that this Settlement Agreement needs to go into evidence. That's all I want. The Settlement Agreement needs to go into evidence, or I'm going to get disbarred.

THE COURT: *Unless you stop right away, I'm going to have to take action that I don't want to take. And that –*

*You may be seated, ma'am.*

2-ER-246 (italics added).

Judge Wilson then turned to Mr. Voss, inviting him to make the defense closing argument, which started without incident, but quickly devolved into this exchange:

MS. LANG: Objection, your Honor. Speculation.

THE COURT: One second please.

If you keep screaming, ma'am, you're going to give me no recourse.

MS. LANG: This is error.

THE COURT: *One minute. I mean, this is getting out of control. I have to just pause for a moment.*

*Mr. Harris, you're co-counsel there. Can you help with controlling things?*

MR. HARRIS: Yes, your Honor.[7]

THE COURT: *I mean, we have to make some order of this, and the screaming and yelling just can't go on.*

---

[7] Attorney Michael D. Harris is Ms. Lang's colleague at SoCal IP Law Group, LLP. He acted as second chair at the trial below.

All right, continue on.

2-ER-248 (italics added).

Mr. Voss continued. But not for long:

MR. VOSS: Surely, then, it would be improper to say that my clients have to provide information that their own investigator who does this for a living couldn't find herself.

MS. LANG: Objection. Foundation.

THE COURT: Overruled.

MS. LANG: My client isn't a distributor.

THE COURT: Is she speaking –

[To Mr. Harris]: *Your co-counsel is muttering and speaking under her breath. I can almost hear her now. Can't we control things?*

MR. HARRIS: We'll do our best, your Honor.

THE COURT: What?

MR. HARRIS: Will do our best, your Honor.

MS. LANG: It's so hard being a woman.

THE COURT: You know, the jury –

*Have the jury go out for a moment. I'm sorry to do this to you.*

2-ER-249-250.

After the jury departed the courtroom, this final exchange

ensued between Judge Wilson and Ms. Lang.

"I'm at the breaking point," said Judge Wilson.  I know of no other way to –"

"No, I am at the breaking point.  I'm at the breaking point," said Ms. Lang.

"You are in contempt," Judge Wilson replied.  "Is the Marshal there?  Take Ms. Lang in custody.  She's in contempt of court."

"I can't.  I have a baby at home," Ms. Lang said.

"There's no other way to maintain decorum in the courtroom," Judge Wilson said.  "Take her into custody."  2-ER-250-251.

Judge Wilson made no mention of bail.  Nor did he offer Ms. Lang the chance to request a stay pending appeal.

Several armed U.S. Marshals, all male, swiftly approached counsel table.  They told Ms. Lang to stand and be handcuffed, then put her in handcuffs.  They added leg irons and a chain, which they looped around Ms. Lang's waist, chest, and shoulders.  The chain ran down the centerline of her body, between her legs.  Marshals used the chain to connect the handcuffs to the leg irons.  They started escorting her to the holding cell in the courtroom,

behind the defense counsel table.  2-ER-55-56.  As they did so, the

court reporter recorded these words:

> MS. LANG:  Michael, I have to pick up my children at
> 4:00 o'clock.
>
> I can't even get a Settlement Agreement into evidence.
>
> This is error.
>
> This is not okay.
>
> I've been practicing in federal court for 15 years.
>
> I'm sorry I'm a young female.
>
> (Ms. Lang weeping.)
>
> This is my livelihood.
>
> (Ms. Lang not present in the courtroom)

2-ER-251.

> It was 3:24 p.m.  23-ER-251.

As the Marshals escorted Ms. Lang into the holding cell, she asked

them to tell her the grounds for her arrest and advise of her rights.  The

Marshals said they didn't know why she'd been arrested.  They said

they just did whatever the judge told them to do.  They didn't advise her

of her rights, tell her what her bail was, or allow her to call anyone.

They did say that they had "never seen this happen to a lawyer before."

2-ER-57.  Ms. Lang didn't resist, use profanity, or utter any kind of

threat.  She complied with all of the Marshals' commands and did not speak disrespectfully to them.

Judge Wilson remarked:

> You know, that's an extreme action, and it's happened only once before in almost 35 years on the bench, but it was totally out of control, and I just had no way to get things under control.

2-ER-251-252.

Judge Wilson invited Mr. Harris to continue in Ms. Lang's stead.  When the jurors returned, Judge Wilson noted Ms. Lang's absence and said that the "reasons for her being present are not in any way relevant.  But Mr. Harris, who is her co-counsel, will continue on representing the plaintiff."  2-ER-253.

Mr. Voss resumed his closing argument.  Meanwhile, the Marshals now decided to escort Ms. Lang to the jail in the basement.  They removed Ms. Lang from the courtroom holding cell and perp-walked past the jury and counsel tables, through the gallery, and out the door, in plain view of all there assembled. Ms. Lang felt humiliated.  2-ER-54-56.

The Marshals walked Ms. Lang barefoot through the tenth floor concourse, to a public elevator, which took the group to the basement,

which houses jail cells designed for holding criminal defendants and suspects. Along the way, Ms. Lang stumbled several times. When they arrived in the basement, the guards took her personal information and booked her as they would a common street criminal. Then they put Ms. Lang in a jail cell and locked her inside. 2-ER-54-55.

Dirt and trash littered the floor of the cell. There was a urinal filled with feces. There were no windows. The cell was cold – it felt "freezing" to Ms. Lang. Ms. Lang couldn't stop weeping. When she asked the Marshals why she was jailed and in irons, the Marshals consistently gave the same answer: "We do whatever the judge tells us to do." 2-ER-54-55.

None of the Marshals or guards could provide Ms. Lang the grounds for her arrest and imprisonment. Nor did they remove her leg irons or any other restraints after placing her in the cell. As Ms. Lang wept, they told her to stop crying and do as she was told if she wanted to return to her family that night and not have to spend the whole night in jail. The chain which was still looped around her waist, chest and shoulders pinned her shoulder and upper body to the chair, which was bolted to the floor. Ms. Lang felt she was going to faint due to loss of

circulation.  She lost a sense of time.  She didn't know what would

happen next or know how long she would be incarcerated.  The only

physical movement Ms. Lang could make was closing her eyes and

crying into her face mask, which the Marshals had left on before leaving

her alone in the cell.  2-ER-56-57.

Judge Wilson had pronounced no sentence, allowed no bail, made

no order to show cause, set no trial date, not allowed Ms. Lang the

chance to ask for a stay pending appeal, and appointed no counsel for

the Court or government.  He ignored the protocol required by Fed. R.

Crim. P. 42.[8]

---

[8] Rule 42 provides:

> **(a)** **Disposition After Notice.**  Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.
>
> (1)   *Notice.*  The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:
>
> (A)   state the time and place of the trial;
>
> (B)   allow the defendant a reasonable time to prepare a defense;  and
>
> (C)   state the essential facts constituting the charged criminal contempt and describe it as such.

Back in courtroom 10A, Messrs. Harris and Voss completed their closing arguments. Judge Wilson then delivered additional instructions to the jurors, about how to organize themselves and deliberate. 2-ER-253-277. The jury then retired to start deliberations.

---

(2) *Appointing a Prosecutor.* The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

(3) *Trial and Disposition.* A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

**(b)** **Summary Disposition.** Notwithstanding any other provisions of these rules, the court (other than a magistrate judge) may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies . . . The contempt order must recite the facts, be signed by the judge, and be filed with the clerk.

Now, for the first time, Judge Wilson made findings,

offering the following monologue to everyone except Ms. Lang:

It should be obvious from what occurred an hour and a half or so ago, but regarding the conduct of Ms. Lang which was almost unprecedented, I have to make a finding of whether I'm to find her in civil criminal contempt [sic], and while I do find there to be an ample bases [sic] for finding her or at least citing her, because the finding has to be done after due process, that is, if she has to have notice in order to show cause with the Court's factual basis an opportunity to respond, and I intend to do that, but as a first matter, I have to decide whether it should be civil contempt or criminal contempt.

As I said, the basic differences in criminal contempt, there is the element of willfulness. I could easily find on this record, easily, that she was willful, with all the warnings. Plus, she continued on even a more heightened way after I initially cited her for contempt for not the outbreak but just for continuingly failing to follow the Court's orders and admonishments after multiple, multiple warnings, and the underlying basis is not only disruption of court proceedings, which she did, but disobedience of judicial order, which she did in abundance, and in doing so disrupted the orderly process of the trial.

And when I ordered her detained, it was my view that I couldn't control the proceedings any longer. I mean, she was just totally out of control and seemed unlikely to regain control. I remember asking Mr. Harris if he could indulge the Court and make some effort, but it seemed that it couldn't be done, and it was just impossible to continue on with the trial. *So, I ordered her incarcerated.*

I didn't want it to be more punitive than necessary, and so I didn't order her booked and processed. She's just in the holding area. And I'm now – since there is no need for this

sanction, that is, incarcerating her, I'm going to order her
released, and I'm going to order the Marshals to escort her
out of the building.

She's not to participate further in this trial. It will have to
be you, Mr. Harris. And I'll have to take up the decision on
civil contempt when the trial is complete and after I make
findings and she has an opportunity to respond.

2-ER-277-278 (italics added).

After having ordered Ms. Lang summarily jailed, Judge

Wilson, bizarrely, added this:

The sanction was not intended to be punitive, because if I
intended to be punitive, I could easily invoke criminal
contempt. Many judges would under these unusual
circumstances, but I don't want to go in that direction. And
so that is what I'm going to do.

2-ER-279.

Down in the basement, Ms. Lang remained chained to a

chair in her cell, in despair, weeping, and oblivious to what was

going on upstairs. She was in physical pain. She felt treated like

an animal. She felt helplessness, fear, powerlessness, and

uncertainty. As she sat in her cell, she knew that hogtied persons

had died of positional asphyxia. During a shift change, guards

lost the key to her handcuffs. After over an hour passed, they

found it again. 2-ER-54.

Upstairs, in courtroom 10A, Mr. Harris addressed Judge Wilson about family problems Ms. Lang had been experiencing.

"Look, what you said is relevant," Judge Wilson replied. "Rest assured it will be considered at the appropriate time." 2-ER-582.

Just as counsel and Judge Wilson were discussing what time they would return to courtroom 10A the next morning, the jury returned a verdict. It was for Athena. The jury found that AMN had not accurately disclosed to Athena the amount of product it had purchased from eBay and had continued selling Athena goods after entering into the settlement agreement. Judge Wilson discharged the jury. 2-ER-284-287.

Mr. Voss announced his intent to seek a "judgment as a matter of law" notwithstanding the jury's verdict. Judge Wilson invited him to do so "in a full-fledged way" the following day at 10 a.m. 2-ER-287.

That evening, Marshals arrived at Ms. Lang's cell. They opened the door, told her the judge would see her now, and escorted her, hobbled, handcuffed, and chained, to the tenth floor

of the courthouse.  During her passage back to the tenth floor, Ms. Lang glimpsed windows, which offered a view outside the courthouse.  For the first time since her descent into the jail, Ms. Lang saw that day had turned into night.  Marshals put Ms. Lang in an empty courtroom (not courtroom 10A), still handcuffed and shackled.  They told her to wait for Judge Wilson and left her there alone.  2-ER-57.

But Judge Wilson was nowhere to be seen.  2-ER-57.

Presently, the Marshals returned.  They told Ms. Lang to get up.  They escorted her back to courtroom 10A.  When they arrived there, they released Ms. Lang, then told her to collect her purse and leave the building immediately.  They told her Mr. Harris could report to her later how the day had ended.  2-ER-57.

Ms. Lang left the courthouse and walked outside.  It was cold and dark.  No one was there to meet her.  The courthouse had long since been closed and all court personnel had gone home for the day.  Ms. Lang's car was in a locked parking lot across the street.  Ms. Lang was stranded at night in downtown Los Angeles.  2-ER-54-55.

The experience left Ms. Lang emotionally scarred.  Ms. Lang had trouble returning to her law practice for a time.  Memories of the episode haunted her for months afterward.  She considers the experience to be one of the most traumatic of her life.  2-ER-53-54.

Only later did Ms. Lang learn Judge Wilson had ordered her disqualified and her name scrubbed from the service list without making any formal order beyond a cryptic entry in the minutes.  Its text read:

> Attorney Marina L. Lang is found in Contempt of Court, and remanded into custody.  Attorney Lang is ordered off the case, released and escorted out of the building.

2-ER-56.

## V.  Ensuing orders re civil contempt.

On December 21, 2021, on the motion which he had invited from defense counsel, Judge Wilson threw out the jury's verdict, ruling it had been tainted by Ms. Lang's misconduct, and ordered a new trial.  2-ER-268-275.

A week later, Judge Wilson issued an order requiring Ms. Lang to show cause why she not be found in civil contempt.  It attributed "repeated outbursts and inappropriate comments" to Ms. Lang, and

asserted that they had "forced" the court to "grant Defendants' motion for a new trial." 2-ER-60. It distinguished between civil and criminal contempt, describing criminal contempt as punitive and imposed to vindicate the court's authority, and civil contempt as having a "remedial purpose[.]" It noted the pretrial order which had "strictly limited the issues for trial to the two forms of breach that [Athena] alleged an the specific, evidence-backed factual theories underlying those two forms of breach." It recited a litany of supposed misconduct by Ms. Lang. The order invited AMN to submit billing records associated with the November 17 trial and scheduled a "hearing on the matter" for January 24, 2022 at 1:30 p.m. Ms. Lang would have the opportunity to file a written response on January 10. 2-ER-60-67.

Ms. Lang filed a declaration on January 10. In it, she denied violating any specific and definite order of Judge Wilson's, and recounted her experience. 2-ER-52-59. Soon afterward, she hired counsel to represent her at the civil contempt hearing. They filed notices of their appearances in the district court on January 18, 2022. 2-ER-20-23.

But two days later, after 5 p.m. on Thursday, January 19 – two business days before the January 24 hearing – Judge Wilson issued a cryptic minute order canceling the hearing, declaring the matter submitted, and saying he would issue a later order finding Ms. Lang in civil contempt. Doc. 215.

That order followed, on January 26, 2022. It said:

As the Court noted after having Ms. Lang removed from the courtroom, her comportment at trial encompassed a level of defiance and disruption that is almost unprecedented in this Court's tenure. *Id*. at 117:24-118:2. The collection of conduct detailed above is made all the more remarkable by the fact that it all occurred within a single day — indeed, within a mere four and half hours that court was in session between the jury being empaneled and Ms. Lang being removed.

Despite multiple warnings, Ms. Lang continued to defy the Court's orders and disrupt the trial to the point that the proceedings completely broke down. In the Court's view, this behavior is more than sufficient to support a finding of civil contempt by clear and convincing evidence. *See Young*, 481 U.S. at 798;[9] *Bagwell*, 512 U.S. at 832;[10] *In re Dyer*, 32 F.3d at 1190-91.[11]

Ms. Lang's primary argument that her conduct did not constitute contempt is that "[n]o court order here restricted

[9] *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 822 (1987).

[10] *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 832 (1994).

[11] *In re Dyer*, 32 F.3d 1178, 1190-1191 (9th Cir. 2003).

the conduct of the attorneys before or during trial" Resp. to OSC 6. Indeed, nothing could be further from the truth — each type of contemptuous conduct identified in the Court's order to show cause ran afoul of specific orders from the Court.

First, Ms. Lang repeatedly referenced the underlying counterfeiting allegations, both in her opening statement and in questioning the only live witness in the case. See Trial Tr. 37:16-38:9, 54:9-56:2, 108:5-7. This violated the Court's pretrial order, which explicitly stated that:

> Plaintiff may not present evidence or argument about the nature of its Revitalash products compared to counterfeit products, characteristics of a counterfeit Revitalash product, or the specific Athena trademarks infringed by a counterfeit product. While these may be relevant to matters in a Phase II trial, concerning Plaintiff's infringement-related claims, they are not relevant to this Phase I trial that focuses solely on the breach of contract claim.

> Trial Prep. Order 8.

Second, Ms. Lang repeatedly interrupted the Court and continued to argue the Court's rulings, despite an explicit instruction not to do so. In a colloquy, the Court cautioned, "You're interrupting me again. And I'm just putting you on notice that if you continue to speak after I make a ruling on an objection, if you respond to what counsel says without permission and if you continue in that vein, it becomes almost impossible for me to control the proceedings." Trial Tr. 47:16-21. However, Ms. Lang continued to interrupt the Court — indeed, doing so just moments later. *Id.* at 48:6-9. Ms. Lang interrupted the Court and continued to argue after the Court had ruled on numerous occasions after this instruction. *See id.* at 48:12-18, 78:15-19, 88:23-89:6, 110:11-111:1, 115:24-116:12, 116:18-21.

And third, as Ms. Lang's disruptive conduct escalated during closing arguments, the Court cautioned to maintain a basic standard of decorum by not raising her voice to the point of shouting. *See id.* at 111:4-5. Yet, in violation of this instruction, she continued yelling her disagreements with the Court, even insisting that she needed to "scream from the top of the wall that this Settlement Agreement needs to go into evidence." *Id.* at 111:13-112:25, 114:14-25, 116:20-117:20. Attorneys should scarcely need to be reminded to maintain a minimum level of civility, but even having been so warned, Ms. Lang continued to disrupt proceedings to the point that order in the courtroom simply broke down.

At bottom, Ms. Lang clearly disagreed with the Court's rulings and conduct — as she has the right to do. However, she did not have license to vent those disagreements in whatever intemperate manner she desired, without any regard for the decorum expected in the courtroom. "If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." *Maness v. Meyers*, 419 U.S. 449, 458 (1975); *see also Galin*, 222 F.3d at 1127.[12] This principle is "especially applicable to orders issued during trial," because "the alternative would be to frustrate and disrupt the progress of the trial." *Maness*, 419 U.S. at 459. Thus, while "[c]ounsel may object to a ruling, [. . .] once the court has ruled, counsel and others involved in the action must abide by the ruling and comply with the court's orders" without "engag[ing] the court in extended discussion once a ruling is made." *Id.*

Ms. Lang's conduct fell short of this standard, violated the Court's orders, and, for the reasons explained in the Court's prior order, necessitated a new trial. That conduct is more than sufficient to warrant a finding of civil contempt.

---

[12] *United States v. Galin*, 222 F.3d 1123 (9th Cir. 2000).

1-ER-2-17.

In the same order, Judge Wilson denied that Ms. Lang's arrest and incarceration were contempt sanctions and that Federal Rule of Criminal Procedure 42 applied.  1-ER-10-13.  He also ordered Ms. Lang to pay $3,510 in sanctions to AMN and Moishe Newman.  1-ER-17.

This timely appeal followed.  3-ER-464.

## SUMMARY OF THE ARGUMENT

Judge Wilson committed clear error and abused his discretion when he found Ms. Lang in civil contempt, because there was no clear and convincing evidence of violation of a specific and definite court order, and Ms. Lang's interpretation of the pretrial order was in good faith and reasonable. This warrants an outright reversal.

Judge Wilson erred by canceling the hearing on civil contempt that he had set for January 24, 2022, thus violating Ms. Lang's right to due process of law under the fourteenth amendment to the U.S. constitution. This is independent grounds for outright reversal.

If it should remand for an evidentiary hearing rather than reverse the civil contempt orders outright, the Court should assign a new District Judge to the case, to uphold the appearance of justice.

## STANDARDS OF REVIEW

The Court reviews a district court's orders finding civil contempt and imposing contempt sanctions for an abuse of discretion. *See Peterson v. Highland Music*, 140 F.3d 1313, 1323 (9th Cir. 1998); *Reebok Int'l, Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 (9th Cir. 1995).

The Court reviews the district court's findings of fact in connection with a civil contempt adjudication for clear error. *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The Court should not reverse a finding of contempt unless it has a definite and firm conviction that the district court committed a clear error of judgment after weighing the relevant factors. *Peterson*, 140 F.3d at 1323 (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)).

The issue of whether a district court provided an alleged contemnor due process is a legal question. The Court reviews it de novo. *See Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996) (citing *Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492 (9th Cir. 1983)).

A district court's finding that a lawyer has violated an *in limine* order is an evidentiary ruling that this Court reviews for an abuse of discretion. *See Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1114, n.12 (9th Cir. 2005).

## ARGUMENT

**I.**    **The district court committed clear error when it found Ms. Lang in civil contempt, because (a) there was no clear and convincing evidence of violation of a specific and definite court order, and (b) Ms. Lang's interpretation of the pretrial order was in good faith and reasonable.**

The party alleging civil contempt must demonstrate, by clear and convincing evidence, that the alleged contemnor (1) violated a specific and definite order of the court, (2) beyond substantial compliance, and (3) not based on a good faith and reasonable interpretation of the court's order. *See Dyer*, 322 F.3d at 1187; *Peterson*, 140 F.3d at 1323; *Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993).

### A.    No clear and convincing evidence of violation of a specific and definite order.

Though nine pages long and single-spaced, Judge Wilson's pretrial order was not so specific and definite as to delimit exactly what Ms. Lang could and could not say about the settlement agreement, which was the contract Athena alleged AMN had breached, in a trial

47

which concerned solely the issue of that breach.  Judge Wilson's second interruption of Ms. Lang's opening statement followed Ms. Lang's saying this:

> And what brought us to the promise, which is the subject Settlement Agreement, starting in 2019.  The evidence will show that Athena Cosmetics, after launching –

Nothing in the pretrial order forbade mention of the prologue to the settlement agreement.  At the moment Judge Wilson interrupted her, Ms. Lang was giving the jurors context for the contract her client alleged AMN breached.  Nothing specific or definite in the pretrial order forbade her from doing so.  Moreover, the pretrial order expressly allowed evidence and argument "necessary to lay a foundation or provide essential background" for the issues at trial.  In saying what she said, Ms. Lang was doing this very thing – giving background on why Athena had entered into the settlement agreement in the first place.

In his first accusation of contempt, Judge Wilson didn't refer to the pretrial order or any other order.  Instead, he told Ms. Lang she didn't listen to his questions, didn't answer his questions, made extraneous statements, and interrupted him.  Though this

argument seems hyper technical, it is also fair: Although every lawyer should listen to and answer the court's questions, refrain from extraneous statements, and not interrupt, nothing in the pretrial or any other order required Marina Lang to do so under pain of contempt.

Similarly, in his next accusation of contempt, Judge Wilson expressed exasperation with Ms. Lang speaking when he didn't want her to speak: "I didn't ask for a comment," he said. When Ms. Lang said she wished to address him on a "different issue," Judge Wilson replied, "You're finding other grounds for being held in contempt." Again, this accusation was untethered to any prior order which Ms. Lang was supposedly violating.

Judge Wilson's next threat came during Ms. Lang's closing argument, in the form of a warning that the judge was going to "take action that I don't want to take" unless Ms. Lang "stop[ped] right away." Ms. Lang apparently triggered it by saying, "Counterfeits are extraordinarily dangerous[,]" prompting a relevance objection from AMN, which Judge Wilson sustained, without referring to any order.

Here, Judge Wilson might have had in mind his pretrial order, which forbade Athena from presenting evidence or argument about the nature of its products compared to counterfeit products, characteristics of a counterfeit product, or other issues related to Athena's infringement-related. But, as to use of the word, "counterfeit," the pretrial order was ambivalent. It listed, as a basis for Athena's breach of contract claim, evidence that Christina Felix had "purchased a *counterfeit* Athena product . . ." And, the day after Judge Wilson filed his pretrial order, Judge Wilson himself instructed the jury that the settlement agreement required AMN to refrain from selling, delivering, marketing, offering for sale, advertising, promoting, displaying or otherwise using "Athena *imitation* products," a term which appears three (3) times in the same jury instruction.

Merriam-Webster's online dictionary defines the adjective, "imitation," as synonymous with these other adjectives: artificial, bogus, dummy, ersatz, factitious, fake, false, faux, imitative, man-made, mimic, mock, pretend, sham, simulated, substitute, synthetic. [https://www.merriam-webster.com/dictionary/imitation#synonyms](https://www.merriam-webster.com/dictionary/imitation#synonyms) Of those synonyms, the

following are also synonyms for the word "counterfeit": fake, forged, phony, bogus, sham – and *imitation*. https://www.merriam-webster.com/dictionary/counterfeit#synonyms

In referring to counterfeit, Ms. Lang did no more than address jurors about an issue Judge Wilson himself had put before them: whether AMN had sold, made, distributed, advertised, or offered for sale goods that were just that: counterfeit, in violation of the settlement agreement which jurors were to decide had or hadn't been breached. In the circumstances, there was no violation of any specific and definite order.

In the exchanges which followed, and up to the point where Marshals hauled Ms. Lang away, Judge Wilson expressed exasperation at what he called "screaming" and "muttering and speaking under her breath" on Ms. Lang's part. Then, after Ms. Lang said it was "hard being a woman," Judge Wilson excused the jury, said he was at the "breaking point," charged her with contempt, and told the Marshals to arrest her – all without saying what, if any, order Ms. Lang had violated.

Certainly, Ms. Lang shouldn't have raised her voice above a level necessary to be heard while masked.  But, on this record, there is no way to tell whether Ms. Lang was "screaming" or "yelling."  Indeed, earlier in the trial, Judge Wilson had complained to Ms. Lang, "[I]t's hard to hear you through your mask."  RT at 109:14-15.  All counsel wore face masks throughout the trial, in accordance with the district court's COVID-19 safety protocols.

Ms. Lang shouldn't have argued with Judge Wilson's evidentiary rulings either.  But, where counsel has made every reasonable effort to comply, a few technical violations do not vitiate substantial compliance with a specific and definite court order.  *See Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.* 689 F.2d 885, 891 (9th Cir. 1982) (three technical violations of court order by using discovery from firs lawsuit to advance the second not clear and convincing evidence of lack of substantial compliance under good faith, reasonable interpretation of order).  Ms. Lang's affidavit proved she made every reasonable effort to comply with Judge Wilson's directives.  That she failed in a few instances, and unintentionally provoked Judge Wilson into severely punishing her, doesn't mean she was in contempt of

court.  (*See In re McConnell*, 370 U.S. 230, 236 (1962) (reversing

judgment of summary criminal contempt;  trial counsel's insistence on

asking questions "unless some bailiff stops us" not sufficiently

disruptive of the trial court's business to constitute obstruction of

justice);  *In re Contempt of Greenberg*, 849 F.2d 1251, 1255 (9th Cir.

1988) reversing summary contempt conviction of lawyer who stated an

objection "at the top of his voice," slammed his hand on counsel table

in an angry manner, and refused to sit down until asked to do so

twice;  emphasizing need to avoid deterring vigorous representation

by conscientious attorneys).

**B.** **Good faith and reasonable interpretation of pretrial order.**

In the heat of trial, Ms. Lang's interpretation of Judge Wilson's pretrial order was in good faith and not unreasonable. Just before being arrested and hauled away by Marshals for mentioning the very settlement agreement that the entire trial had been about, Ms. Lang told Judge Wilson, "Your Honor, *I don't know what I'm allowed to argue . . .*" By itself, this statement proves that Ms. Lang was operating in good faith and being reasonable.

No affidavit which would contradict Ms. Lang's affidavit appears in the record. Had Judge Wilson allowed live testimony below, he, or counsel, could have cross-examined Ms. Lang about her interpretation of the pretrial order and challenged its reasonableness. But Judge Wilson foreclosed that possibility when he scrubbed the January 24 hearing. Taken together, these things are independent grounds for reversal of Judge Wilson's order adjudging Ms. Lang in civil contempt. *See Lasar*, 399 F.3d at 1110 (citing *Taylor v. Hayes*, 418 U.S. 488, 499 (1974)).

**II. The district court erred by finding Ms. Lang in civil contempt and ordering her to pay monetary sanctions without holding a hearing or allowing Ms. Lang to testify or call witnesses in her own defense, thus depriving Ms. Lang of due process of law.**

The seventeen words of the fourteenth amendment's Due Process Clause[13] are cryptic and abstract. *See Armstrong v. Manzo*, 380 U.S. 545, 550 (1965). To determine what they mean in a given situation, the courts have fashioned rules which are easy to articulate and hard to apply; no mechanical formula governs. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695. *See Groppi v. Leslie*, 404 U.S. 496, 500 (1972). But, at a minimum, those rules demand the opportunity to be heard in one's own defense before punishment is imposed, something that is basic in American jurisprudence. *Groppi*, 404 U.S. at 502. The district courts must afford this opportunity at a

---

[13] The Due Process Clause of the fourteenth amendment provides:

> . . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . .

meaningful time and in a meaningful manner.  *Armstrong*, 380 U.S.  at

552, citation omitted.

In the contempt setting, the courts allow, but don't require in

every instance, a hearing before a person may be adjudged in civil

contempt.  *See In re Osborne*, 344 F.2d 611, 616 (9th Cir. 1965).  They

permit an alleged contemnor-attorney the chance to argue at a live

hearing that her actions were an acceptable means of representing her

client, to present mitigating circumstances, and apologize to the district

court for her conduct.[14]   At such a hearing, the alleged contemnor

might urge that her behavior wasn't contemptuous but instead the

acceptable conduct of a lawyer representing her client.  *Lasar*, 399 F.3d

at 1110.  In order to let that happen, the district court ordinarily

shouldn't impose contempt sanctions solely on the basis of affidavits,

unless the affidavits offered in support of a finding of contempt are

uncontroverted or the alleged contemnor doesn't seek to present her

defense through live testimony.  *See Kismet Acquisition, LLC v. Diaz-*

*Barba (In re Icenhower)*, 755 F.3d 1130, 1139 (9th Cir. 2014) (citing

---

[14]  Ironically, Judge Wilson's own order acknowledges this.  **[(@ p. 7)]**

*Peterson*, 140 F.3d at 1324); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999) (citing *Peterson*, 140 F.3d at 1324)).

There is good reason for this rule. The heightened potential for abuse posed by the sweeping nature of the courts' contempt power makes the opportunity to be heard essential. *See Lasar*, 399 F.3d at 1110 (citing *Taylor*, 418 U.S. at 500).

In *Taylor*, Dan Taylor, who was defense counsel in a murder trial, angered the trial judge, John P. Hayes, prompting Judge Hayes to inform Taylor he was in contempt of court. After the jury returned a guilty verdict, Judge Hayes offered a monologue about what he perceived as Taylor's "deceit," "trickery," and "planned confusion" during the trial, which assertedly included ignoring Judge Hayes' order not to continue a certain line of questioning during voir dire. Judge Hayes refused Taylor's request to respond and declared, "I have you [on] nine counts." Judge Hayes insulted Taylor, saying, "As far as a lawyer is concerned, you're not." He ordered Taylor jailed, refusing him any bail. A few days later, the judge barred Taylor from practicing law in his court. 418 U.S. at 489-494.

The Supreme Court reversed, holding that the Due Process Clause entitled Taylor to "more of a hearing and notice than he received prior to final conviction and sentence." The court also remanded for the hearing that Judge Hayes had failed to give Taylor and ordered the case assigned to a new judge. *Taylor*, 418 U.S. 501-504.

Though *Taylor* involved criminal contempt and not civil contempt, the same considerations that compelled its result apply here. Ms. Lang was told she would have a live hearing and prepared for one. Had she had one, she would have testified, and offered the live testimony of other witnesses, about what happened in courtroom 10A on November 17, 2021. She would have explained the mitigating factors mentioned by her co-counsel, Mr. Harris, after Judge Wilson ordered her arrested. She could have said she was sorry for interrupting Judge Wilson, arguing with his rulings, and raising her voice. Judge Wilson prevented her from doing any of that, except through an affidavit – which Judge Wilson, in a sixteen-page, single-spaced order, silently ignored, except for a dismissive line stating that "nothing in Ms. Lang's response disputes any of the material facts[.]" This was a violation of the Due

Process Clause. It mandates reversal. *See Taylor*, 418 U.S. at 501-504. *See also Ayres*, 166 F.3d at 995 (*quoting Peterson*, 140 F.3d at 1324).

In scrubbing the January 24 hearing, Judge Wilson wrote that what had happened was "more than sufficient to support a finding of civil contempt by clear and convincing evidence[,]" citing *Bagwell*, *Ayres*, and *Little v. Kern County Superior Court*, 294 F.3d 1075, 1080 (9th Cir. 2002).

This statement was unconvincing. Judge Wilson didn't adorn it by explaining why, if the events of November 17 so clearly and convincingly evidenced civil contempt, he had set the January 24 hearing in the first place; the hearing hardly would have been necessary if there were no need to take testimony or hear argument. And none of the three cases warranted what he did; each is distinguishable.

*Bagwell* involved fines imposed for criminal contempt committed outside the court's presence. Importantly, the court in *Bagwell* didn't address the issue of whether the Due Process Clause required an evidentiary hearing before the imposition of civil contempt fines. The issue wasn't before the court, because the trial court in *Bagwell* had

held seven (7) contempt hearings (sans jury), in which parties conducted discovery, introduced evidence, and called and cross-examined witnesses. The issue below, and here, was whether Ms. Lang was entitled to the sort of evidentiary hearing that was had in *Bagwell*. She was. *See Lasar*, 399 F.3d at 1110 (citing *Taylor*, 418 U.S. at 499).

*Ayres*, too, offers no support for Judge Wilson's justification for scrubbing the January 24 hearing. In *Ayres*, the Court reaffirmed the familiar rule that the Due Process Clause doesn't require a full-blown evidentiary hearing in every instance. But, in language unacknowledged by Judge Wilson, the Court also reaffirmed its teaching in *Peterson* that the district court "ordinarily should not impose contempt sanctions solely on the basis of affidavits." *Ayres*, 166 F.3d at 995 (*quoting Peterson*, 140 F.3d at 1324). Judge Wilson did that very thing, silently defying the rule.

Like *Ayres*, *Little*, another criminal contempt case, undermines, rather than supports, Judge Wilson's cancellation of the hearing below. In *Little*, the trial judge summarily found the lawyer-contemnor, Little, in contempt, asked him if he had anything to say, and then sentenced Little to jail. California law, not federal law, governed. After Little

exhausted his appellate remedies in the California courts, he filed a habeas petition, which the district court granted, prompting the County of Kern to appeal. This Court held that the judge's failure to give Little a fair opportunity to be heard on the merits of the contempt charge violated Little's due process rights. 294 F.3d at 1080, 1081. Judge Wilson's citation of *Little* as authority for canceling a hearing which this Court has taught is required is hard to understand.

Judge Wilson's deliberate elimination of a fair hearing deprived his January 26 order of any validity. This is independent grounds for its outright reversal. *See Taylor*, 418 U.S. at 497-500.

**III. If it should remand for an evidentiary hearing rather than reverse the civil contempt order outright, the Court should assign a new District Judge to the case.**

When the District Judge could be reasonably expected on remand to have substantial difficulty in putting out of his mind previously expressed views or findings determined to be wrong, or reassignment is necessary to uphold the appearance of justice, this Court orders the clerk of the district court to assign the case to a new District Judge after remand. *Ellis v. U.S. Dist. Court (In re Ellis)*, 35 F.3d 1198, 1211 (9th Cir. 2004) (en banc); *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 779-782 (9th Cir. 1986) (collecting cases).

So it should be here. Judge Wilson's own *post hoc* words and actions prove the need for reassignment.

According to Judge Wilson's January 26 order, his order that Ms. Lang be arrested and thrown in jail *wasn't a contempt sanction in the first place.* "Ms. Lang's Removal from the Courtroom was Not a Contempt Sanction," reads this portion of Judge Wilson's order. Elsewhere, this: "Ms. Lang's removal from the courtroom was *not* a contempt sanction at all." Instead, wrote Judge Wilson, it was

"pursuant to the Court's well-established authority to remove disruptive participants and maintain order in the courtroom." Indeed, wrote Judge Wilson, he did Ms. Lang a favor, by supposedly avoiding the "punitive measure" of criminal contempt:

> [T]he fact that the Court opted to simply temporarily remove Ms. Lang, rather than to summarily adjudicate and sentence a criminal contempt charge – which would have been well-within the Court's authority – merely reflects the Court's desire to avoid that punitive measure.

> In sum, the Court exercised its authority to remove Ms. Lang for her disruption; nothing about that decision precludes a later civil contempt proceeding to impose the costs of that disruption on Ms. Lang.

> Elsewhere, in a footnote, Judge Wilson wrote that he had "taken pains to avoid more punitive measures, such as criminal contempt."

None of this was true. All of it is irreconcilable with what he said in open court at the moment he ordered Marina Lang arrested and jailed on November 17:

> *You are in contempt.* Is the Marshal there? Take Ms. Lang in custody. *She's in contempt of court.*

As though conscious of the incongruity, Judge Wilson dropped a footnote in his January 26 order, acknowledging that he

had said, "'You are in contempt,' to Ms. Lang before ordering her

removed." But, Judge Wilson added, he hadn't really meant it:

> [T]his was not an actual summary contempt adjudication;
> the Court did not pronounce a sentence, nor complete a
> summary contempt certification, as required under Fed. R.
> Crim. P. 42(b).

\*   \*   \*

> [H]er removal was not a contempt sanction at all – whether
> civil or criminal – rather it was an exercise of the Court's
> authority to maintain order, necessary as the only way to
> keep Defendants' closing argument from being further
> disrupted.

\*   \*   \*

> Ms. Lang's removal from the courtroom was *not* a contempt
> sanction at all.

(Italics in original, citation omitted).

These words should be viewed as what they are: *post hoc*,

self-serving obfuscation. In the span of three sentences, Judge

Wilson told Ms. Lang, *twice*, she was in contempt. Having failed

to follow the rules for summary punishment of contempt – rules

which this Court enforces by reversing summary contempt

judgments entered without observance of them[15] – he then

---

[15] *See United States v. Glass*, 361 F.3d 580, 589-591 (9th Cir. 2004)
(reversing order holding defendant in summary criminal contempt;
district court failed to comply with Rule 42(a)).

declared what he did to be something else.  This was less judicial

pronouncement than advocacy, a re-interpretation of plain

English by means which recall Lewis Carroll[16] – not a

straightforward account of what happened.

Judge Wilson's jailing of Ms. Lang was imposed

retrospectively for a completed act of disobedience.  Ms. Lang

could not have avoided it or abbreviated her confinement through

later compliance.  Thus it required heightened procedural

requirements – those supplied by Rule 42, which Judge Wilson

pointedly ignored at the time and later said didn't apply because,

even though he'd said "contempt" twice, he hadn't really meant it.

This was error.  *See Gompers v. Bucks Stove & Range Co.*, 221

---

[16]     "When *I* use a word," Humpty Dumpty said in rather a
scornful tone, "it means just what I choose it to mean—
neither more nor less."

"The question is," said Alice, "whether
you *can* make words mean so many different
things."

"The question is," said Humpty Dumpty, "which is
to be master—that's all."

LEWIS CARROLL, THROUGH THE LOOKING-GLASS, ch. 6 (Macmillan 1872)
(italics in original).

U.S. 418, 443 (1911) (prison sentence for violation of injunction could have been "properly imposed only in a proceeding instituted and tried as for criminal contempt"); *Ayres*, 166 F.3d at 997 (reversing order assessing $1,500 fine on appellant-contemnor; district court "effectively imposed punitive, rather than coercive, contempt sanctions without following the heightened procedural requirements for such sanctions"). Judge Wilson's *post hoc*, self-serving account of what he did portends more of the same on remand, warranting reassignment to a new Judge.

In aggravation, Judge Wilson excused himself for any responsibility for the medieval treatment inflicted on Ms. Lang by the Marshals:

> [A]s this Court has frequently noted, it sought to *avoid* imposing a punitive measure under the Court's criminal contempt authority. It was for this reason that the Court did not order her to be booked and processed into custody, as it would have if it had summarily punished Ms. Lang for criminal contempt.

But Ms. Lang *was* booked and processed into custody, by Marshals who repeatedly told Ms. Lang, "*We just do what the judge tells us to do.*" If the facts were different, perhaps Judge Wilson could claim ignorance of the booking and processing into

custody.  But he can't – Ms. Lang's own affidavit, filed before entry of the January 26 order, described it in detail.  Judge Wilson ordered the Marshals to do what they did and they did it.  There is no pretending that he didn't or that they didn't.  If, by writing the passage quoted above, Judge Wilson sought tacitly to blame the Marshals for the grim conditions of Ms. Lang's confinement, as though he didn't foresee the entirely-foreseeable results of his order, then those words seem callous and out of touch at best, and deliberately blind at worst.

The same is true of Judge Wilson's silence as to what Ms. Lang experienced after Marshals escorted her out.  "Court security officers detained Ms. Lang in a holding area so that Mr. Voss could conclude his closing argument," wrote Judge Wilson, without elaboration, as though the several hours which Ms. Lang passed chained to a chair in the basement didn't happen at all.  Here, Judge Wilson's order strays from a neutral recitation of the hard facts into more self-serving argument.  On November 17, Judge Wilson said, *"I ordered her incarcerated,"* which was, of course, exactly what he did.

In word and deed, Judge Wilson has made clear his scorn for Ms. Lang and his sophistic disdain for the requirements of Rule 42 and the Due Process Clause.  The appearance of justice cannot be served by a remand to him.  *See Taylor*, 418 U.S. at 501-504;  *In re Ellis*, 35 F.3d at 1211;  *Earp v. Cullen,* 623 F.3d 1065, 1072, 1078 (9th Cir. 2010);  *Living Designs, Inc., v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 373 (9th Cir. 2005);  *Sears, Roebuck*, 785 F.2d at 779-782.

In another case involving Judge Wilson, the Court ordered the case reassigned to a new District Judge on remand, reasoning that Judge Wilson could reasonably be expected to have difficulty putting out of his mind previously-stated views which the Court determined to be wrong.  *See United States v. Gardenhire*, 784 F.3d 1277, 1284 (9th Cir. 2014).  So it should do here.

# CONCLUSION

Disciplinary authorities have grown more vigilant to tyrannical treatment of lawyers by judges in the courtroom. Recently, the Texas Commission on Judicial Conduct publicly reprimanded a State court judge, Barbara Stalder, for ordering two attorneys in her courtroom shackled to chairs in the jury box during hearings and banning one of them from returning to her courtroom. The commission wrote this:

> Judge Stalder's failures in these respects constituted willful and/or persistent failures to be patient, dignified and courteous toward the attorneys; willful and/or persistent disregard for [their] rights to be heard according to law; and willful and/or persistent conduct that is clearly inconsistent with the proper performance of her duties and that cast public discredit upon the judiciary or the administration of justice . . .

*See* accompanying request for judicial notice.[17]

The federal judiciary has no close analogue to a state commission on judicial conduct. But it has this Court.

If allowed to stand, Judge Wilson's rulings will send a poor and dangerous message to every attorney practicing in every district court in this Circuit. That message will be that no attorney, on a bad day or a

---

[17] Public reprimand, *In re Hon. Barbara Stalder*, CJC No. 20-0880 (Texas State Commission on Judicial Conduct April 20, 2022).

good one, will be safe from being shackled, frog-marched to jail in front of client, counsel, and jurors, fined, and held in contempt without a hearing, should she offend the District Judge with advocacy that is deemed to cross a line.  In resolving doubts about whether a lawyer's courtroom behavior has crossed the line between vigorous advocacy and actual obstruction, this Court errs on the side of n favor of vigorous advocacy.  *Greenberg*, 849 F.2d at 1255.  This is as it must be.

This appeal offers no remedy for Judge Wilson's summary arrest and incarceration of Ms. Lang on November 17, 2021, disqualification from representing her client in the case, and concomitant harm to her reputation.  Any prospective client or referral source with a PACER account can see for themselves what happened in Judge Wilson's courtroom and decide how it affects the decision to hire, or not hire, Marina Lang as their counsel in the future.  *See In re Tillman*, 756 F.2d 1144, 1151 (9th Cir. 2014) (lawyers' professional reputations "are the essence of their livelihood").  Should that decision be negative, it will be made in private, and Ms. Lang will likely never know it.  The Court expressly recognizes the seriousness of this harm to attorneys who are wrongly sanctioned by District Judges in this Circuit.  *See Tillman*, 756

F.2d at 1146, 1151-1152 (9th Cir. 2014) (reversing district court's order imposing sanctions without a hearing; improper sanctions order affected counsel's professional reputation). This harm is irremediable.

But the harm inflicted by Judge Wilson's deeply flawed order finding Ms. Lang in civil contempt is remediable.

The Court should reverse Judge Wilson's orders of December 27, 2021, and January 26, 2022, and hold that Ms. Lang did not commit any act of civil contempt. At a minimum and in the alternative, the Court should remand with instructions that the district court, by a judge other than Stephen V. Wilson, afford Ms. Lang the evidentiary hearing which Judge Wilson scheduled and then vacated.

Respectfully submitted,

KLINEDINST PC

DATED: June 22, 2022     By: _s/Dan Lawton_____
                              Heather L. Rosing
                              Dan Lawton
                              Irean Z. Swan
                              Attorneys for Real-party-in-interest-
                              Appellants

# **CERTIFICATE OF COMPLIANCE**

I, undersigned, am counsel to Marina L. Lang and SoCal IP Law, LLP, who are the real-party-in-interest-appellants in this matter. This brief contains 12,950 words, except for the items excluded by Fed. R. App. P. 32(f) and Cir. Rule 32-1(c). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Respectfully submitted,

KLINEDINST PC

DATED: June 22, 2022     By:  s/Dan Lawton
                               Heather L. Rosing
                               Dan Lawton
                               Irean Z. Swan
                               Attorneys for Real-party-in-interest-
                               Appellants Marina L. Lang and SoCal
                               IP Law Group, LLP